IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Consolidated Action

| | | |
|---|---|---|
| WAKE COUNTY BOARD OF EDUCATION, | ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | No. 5:19-CV-497-BO |
| S.K., by and through her parent, R.K., Defendant. | ) ) ) | |

| | | |
|---|---|---|
| RHONDA K., individually and on behalf of S.K., her minor child, | ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | No. 5:19-CV-498-BO |
| WAKE COUNTY BOARD OF EDUCATION, | ) ) | |
| Defendant. | ) | |

## ORDER

This consolidated action is before the Court on Wake County Board of Education's motion for judgment on the administrative record and Rhonda K.'s motion for attorney fees and expenses. The motions have been fully briefed and are ripe for ruling. For the reasons that follow, both motions are granted in part and denied in part.

## BACKGROUND

### *Procedural History*

On December 29, 2017, S.K., by and through her parent R.K., filed a petition for a contested case hearing in Wake County, North Carolina, asserting claims against the Wake County Board of Education (WCBOE) pursuant to the Individuals with Disabilities Education Improvement Act of 2004 (IDEA), 20 U.S.C. §§ 1400, *et seq.*; N.C. Gen. State §§ 115C-109.6,

*et seq.*; and Article 3 of Chapter 150B of the North Carolina General Statutes. [DE 18-8 at 7].[1] The petitioners below[2] alleged that the WCBOE had failed to: offer S.K. a free and appropriate public education, develop substantively and procedurally valid Individualized Education Programs (IEPs) for S.K., provide substantively appropriate school placement to S.K., employ adequate placement procedures, properly evaluate S.K. and employ proper evaluative procedures, properly consider S.K.'s need for related services, properly consider S.K.'s need for extended school year services, follow the requirements set forth in the IDEA, and follow the North Carolina law as provided in Section 115C-109.6, *et seq.*, of the North Carolina General Statutes. *Id.*

Between March 19 and March 26, 2018, an evidentiary hearing was held by a North Carolina Administrative Law Judge (ALJ). [DE 18-17 at 20]. The ALJ's final decision, issued on July 31, 2018, held in favor of WCBOE.[3] The ALJ determined that the IEP present levels and goals were appropriate, that a class-size cap was not a required accommodation for S.K., that service delivery was appropriate, that a transition plan was not legally required, and that the May 2017 IEP provided S.K. a free and appropriate public education. The ALJ further concluded that S.K.'s placement had not been predetermined and made provisional conclusions that the private school program was not appropriate, and that, had S.K. prevailed, the ALJ would have been inclined to reduce the private tuition reimbursement. Finally, the ALJ concluded that S.K. had failed to satisfy her burden to show that the WCBOE had failed to offer her a free and appropriate education through May 19, 2017 and dismissed S.K.'s claims with prejudice. *Id.* at 77-81.

---

[1] Due to the size of the administrative record, all citations will reflect the CM/ECF file stamp page number.

[2] The petitioners below will be referred to throughout this order collectively as S.K. Rhonda K. will be referred to where she is the moving party.

[3] The ALJ's decision is found in the administrative record filed at [DE 18-17 at 20-81].

2

S.K. appealed the ALJ's decision pursuant to N.C. Gen. Stat. § 115C-109.9. *Id.* at 89. On August 9, 2019, a State Hearing Review Officer (SHRO) for the State Board of Education resolved the appeal.[4] [DE 18-7 at 136-37]. The SHRO affirmed in part and reversed in part the ALJ's final decision and further affirmed in part, reversed in part, and remanded the ALJ's prior order granting in part WCBOE's Rule 41 motion to dismiss. The ALJ's final decision was reversed as to its holding on the following issues: whether the May 2017 IEP denied S.K. a free and appropriate public education based on its failure to incorporate any accommodation to support S.K.'s need for a small-class, small-school setting in the general-education environment, whether Camelot Academy was an appropriate private placement, and whether R.K. acted unreasonably throughout the IEP process.

On November 6, 2019, WCBOE initiated an action in this Court seeking relief from the SHRO's decision. No. 5:19-CV-497-BO. The same day, Rhonda K. initiated an action in this Court seeking an award of attorney fees and costs and reimbursement of private school tuition. No. 5:19-CV-498-BO. The cases were subsequently consolidated.

## *Factual Background*

The following is a summary of the factual background of this matter drawn primarily from the stipulated facts by the parties in the final pretrial order before the ALJ. [DE 18-12 at 146-157].

S.K. was born in September 2002 and was fifteen years old at the time of the filing of the petition. S.K. was a child with a disability as defined by the IDEA and eligible for services under the IDEA. S.K. began attending school in the Wake County Public School System (WCPSS) in kindergarten and remained enrolled there through part of eighth grade.

---

[4] The SHRO's decision is found in the administrative record filed at [DE 18-17 at 95 through 18-18 at 138].

3

S.K.'s March 2016 IEP, which is not directly at issue in this case, found that she was an intelligent student who was able to meet, but was not meeting grade level expectations. S.K.'s teachers noted that she struggled with socialization, behavior, isolation from peers, and concerns about bullying. S.K. had earned F grades in math and a Level 1, the lowest score, on her most recent end-of-grade test in math. S.K. had also earned a Level 1, the lowest score, on her most recent end-of-grade test in reading. S.K.'s deficits in writing were found to impact her across the general education curriculum.

In March 2016, prior to the end of her eighth-grade year, S.K.'s parents enrolled her in the Asheville Academy for Girls (Asheville Academy), a private therapeutic boarding school. At Asheville Academy, S.K. was enrolled in academic classes as well as individual and family therapy. In June 2016, S.K. underwent comprehensive psychological and educational evaluations with Dr. Anna Edwards-Gaura.[5] The testing revealed an average IQ, delayed processing speed, and working memory challenges. S.K. was documented to have clinically significant executive functioning weakness in behavior regulation and metacognition. Dr. Edwards diagnosed S.K. with Autism Spectrum disorder; Unspecified Anxiety Disorder; ADHD, Primarily Inattentive Presentation; Specific Learning Disorder with impairments in math and reading; and Developmental Coordination Disorder (Dysgraphia).

S.K.'s social and emotional challenges included cognitive rigidity, sensory integration difficulties, inappropriate behavior, and slow processing speed. Prior to her enrollment at Asheville Academy, S.K.'s frustrations with academic demands, other students, and being asked to do things she did not want to do, including following through with some of her OCD behaviors, would result in meltdowns in the classroom consisting of shouting, crying, and

---

[5] The administrative decisions refer to Dr. Edwards-Gaura as Dr. Edwards, and this Court will do the same.

4

throwing herself on the floor. In January 2017, an Individualized Academic Plan (IAP) was developed at Asheville Academy. The IAP noted that at present S.K. "had made great strides with the supports in place and is displaying a more engaged and positive attitude across the board." [DE 18-17 at 37].

In her third quarter at Asheville Academy, S.K. earned A and B grades. It was noted that during her year at Asheville Academy, S.K. no longer had meltdowns, she had developed positive relationships with peers and staff, and with universal supports she was able to meet behavioral and academic expectations. [DE 18-17 at 43]. In February or March of 2017, R.K. began exploring options for S.K. to return to the WCPSS. On March 23, 2017, R.K. requested a list of suggested WCPSS high schools that would be appropriate for S.K. R.K. requested the opportunity to tour the schools with staff members from Asheville Academy prior to an IEP meeting that was scheduled for April 21, 2017. The IEP meeting was rescheduled, and R.K. was provided with possible WCPSS school assignments on April 27, 2017. Members of WCPSS also visited Asheville Academy to gain information about the program and on April 19, 2017, a draft IEP was provided to the Asheville Academy and R.K. The IEP accepted Dr. Edwards's evaluation and used that information in completing the IEP. On May 19, 2017, a reevaluation and annual review IEP meeting was held. R.K. and her parent advocate as well as an administrator, psychologist, autism specialist, occupational therapist, attorney, and others from WCPSS participated in the IEP meeting.

At the end of the meeting, R.K. rejected the IEP. Through her advocate, R.K. asked about a private school setting. The IEP Team explained that the IEP could be implemented in a WCPSS school. R.K. subsequently requested a transfer from S.K.'s base school assignment to a magnet school where options for S.K. might be more fitting. The transfer request was denied and

5

R.K. did not appeal the denial. R.K. subsequently enrolled S.K. in Camelot Academy in Durham, North Carolina by submitting paperwork on July 2, 2017. On July 6, 2017, R.K. emailed the principal of S.K.'s assigned WCPSS base school stating that she had rejected the IEP developed at the May 19, 2017, meeting and that since there was no appropriate program in place for S.K. in WCPSS she would enroll S.K. in private school and seek reimbursement from WCPSS. S.K. began school at Camelot Academy on August 24, 2017.

S.K. performed well at Camelot Academy. She was described as having been able to "maintain emotional regulation and meet academic, behavioral, and social expectations throughout the school day." [DE 18-14 at 12].

## DISCUSSION

### *Motion for Judgment on the Administrative Record*

WCBOE seeks entry of judgment in its favor on the administrative record and asks the Court to reverse the SHRO's decision and reinstate the ALJ's decision in full. S.K. asks the Court to not disturb the well-reasoned and well-supported decision of the SHRO.[6]

The IDEA was enacted in part

to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.

20 U.S.C. § 1400(d)(1)(A). To further this end, the IDEA offers federal funds to states in exchange for a commitment to furnish a "free appropriate public education" (FAPE) to all children with certain physical or intellectual disabilities. 20 U.S.C. § 1401(3)(A)(i). A FAPE comprises special education and related services and includes both instruction tailored to meet a child's unique needs and sufficient supportive services to permit the child to benefit from that

---

[6] At the outset, the Court in its discretion grants S.K.'s motion for leave to file a surreply.

6

instruction. 20 U.S.C. §§ 1401(9), (26), (29); *see also Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 203 (1982). An eligible child acquires a substantive right to such an education once a state accepts the IDEA's financial assistance. *Smith v. Robinson*, 468 U.S. 992, 1010 (1984).

Under the IDEA, an IEP serves as the primary vehicle for providing each child with the promised FAPE. *Honig v. Doe*, 484 U.S. 305, 311 (1988); 20 U.S.C. § 1414(d). An IEP is crafted by the child's school officials, teachers, and parents and spells out a personalized plan to meet all of the child's educational needs. 20 U.S.C. §§ 1414(d)(1)(A)(i)(II)(bb), (d)(1)(B). "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017). The IDEA establishes that any disputes involving the FAPE or IEP are to be resolved through state administrative procedures. 20 U.S.C. § 1415.

North Carolina has adopted a two-tiered administrative review process. The first tier is an evidentiary hearing before an ALJ following the filing of a petition with the Office of Administrative Hearings (OAH). *See E.L. ex rel. G.L. v. Chapel Hill-Carrboro Bd. of Educ.*, 975 F. Supp. 2d 528, 532 (M.D.N.C. 2013) (citing N.C. Gen. Stat. § 115C-109.6). A party may then appeal the ALJ's decision at the OAH level to the State Board of Education which, "through its Exceptional Children Division, appoints an [SHRO] to review the ALJ's findings appealed and issue an independent decision." *Id.* Any aggrieved party may then file a civil action in state or federal court within ninety days from the date of the hearing officer's decision or within the time prescribed by state law. 20 U.S.C. § 1415(i)(2).

"[T]he federal action is an independent civil action and not an appeal of the state administrative proceeding." *Cty. Sch. Bd. of Henrico Cty., Virginia v. Z.P. ex rel. R.P.*, 399 F.3d 298, 304 (4th Cir. 2005).

> [T]he IDEA requires that a reviewing court (1) receive the record of the administrative proceeding, (2) hear additional evidence at the request of a party, and (3) base its decision on the preponderance of the evidence. Under this standard, the district court must conduct an independent, de novo review, albeit one generally cabined by the record of the administrative proceedings. In this posture, the district court must give "due weight" to the administrative proceedings, bearing in mind that a hearing officer's findings of fact are entitled to "be considered prima facie correct." In a two-tiered system, such as North Carolina's, a review officer's decision is also entitled to deference unless it departs from the "normal process of fact-finding."

*E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 517-17 (4th Cir. 2014) (internal emphasis and citations omitted); *see also MM ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 531 (4th Cir. 2002) ("findings of fact made in administrative proceedings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why."). The burden of proof is on the party who brings the civil action challenging the state administrative decision. *Spielberg by Spielberg v. Henrico Cty. Pub. Sch.*, 853 F.2d 256, 258 n.2 (4th Cir. 1988).

I.    Due Weight and Credibility of the Witnesses.

Because the SHRO and the ALJ decisions are in conflict, the Court "must initially determine whether the ALJ's decision or the S[H]RO's decision is entitled to due weight." *Wittenberg v. Winston-Salem/Forsyth Cty. Bd. of Educ.*, No. 1:05CV818, 2008 WL 11189389, at *3 (M.D.N.C. Nov. 18, 2008).

> When the decisions of administrative hearing officers and review officers conflict, "due weight" is generally given to the administrative hearing by according the hearing officer's findings of fact a rebuttable presumption of prima-facie correctness. But in particular circumstances, reviewing courts may defer to the findings of the review officer rather than those of the hearing officer, such as where (1) the review officer's decision does not turn on witness credibility but on

the weight of the evidence, or (2) the hearing officer's opinion is cursory and conclusory, or (3) the review officer provides reasons for departing from the hearing officer's findings.

*D.B. v. Craven Cty. Bd. of Educ.*, 210 F.3d 360 (4th Cir. 2000) (unpublished) (citing *Springer v. Fairfax Cty. Sch. Bd.*, 134 F.3d 659, 663 n.\* (4th Cir. 1998)). In determining whether findings of fact were regularly made, a court "should examine the way in which the state administrative authorities have arrived at their administrative decision and the methods employed." *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991).

WCBOE contends that the SHRO's decision should be afforded no deference because she abandoned the ALJ's thorough credibility determinations. WCBOE contends that the SHRO paid "lip service" to the idea of deference, but abandoned that deference, relying inappropriately on a Third Circuit decision finding that if there was evidence in the record to support her disagreement it was acceptable to abandon her deference to the ALJ.

S.K., on the other hand, argues that the SHRO properly exercised her authority to conduct a review of the decision wherein she was not required to accept factual findings, including credibility determinations, that were unsupported by the record. S.K. contends that factual findings without evidentiary support are not findings that were "regularly made" and are thus not entitled to deference under *Doyle* and its progeny.

At the outset, the Court determines that the SHRO's reliance on the Third Circuit's decision in *Carlisle Area School District v. Scott P.* was not misplaced where that court, in determining which standard it would apply when reviewing conflicting administrative decisions under a two-tier system, decided that it would "embrace the Fourth Circuit's approach in *Doyle* [] to the extent that that decision was premised on this specific principle, that credibility-based findings deserve deference unless non-testimonial, extrinsic evidence in the record would justify

9

a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 528 (3d Cir. 1995).

A review of the record in this matter reveals that the SHRO did not pay lip service to the idea of deference. Rather, the SHRO went through the record in painstaking detail and declined to assign weight to credibility determinations that were based on factual inaccuracies in the record or were otherwise completely unsupported. In so doing, the SHRO did not decline to give due weight to the ALJ's credibility decisions insofar as those decisions were based upon matters that only the ALJ could have witnessed first-hand, such as the demeanor of the witness or the witness's tone when answering questions on direct and cross-examination. The SHRO properly reviewed the entire record, including the transcripts of the hearing, and, where the ALJ based decisions of how much weight to assign to a witness on statements that were either not found in the transcript or not supported by the transcript, the SHRO decline to afford the ALJ's weight determinations due deference.

For example, in her decision the ALJ held that Dr. Kreig, who testified for WCBOE, had been received as an expert in educational planning for students with autism when in fact the ALJ had at the hearing expressly declined to receive Dr. Kreig as an expert in educational planning for students with autism. *See* [DE 18-17 at 141]; [18-4 at 32]. This error was not harmless, because in her decision the ALJ relied on Dr. Kreig's non-expert testimony in this area over the testimony of S.K.'s expert in this area, Dr. Leach. [DE 18-18 at 21].

WCBOE also contends that the SHRO improperly rehabilitated the credibility of witnesses that the ALJ found unconvincing or unhelpful, specifically Dr. Leach, Dr. Edwards,

Ms. Mojave, and R.K. WCBOE further contends that the SHRO improperly discredited its witnesses, whom the ALJ had found convincing and credible.

Review of the record in this matter does not support WCBOE's arguments. In reviewing the ALJ's treatment of the witnesses at the hearing, the SHRO noted that the ALJ diminished the credibility of all of S.K.'s witnesses and none of WCBOE's. This is notable as none of WCBOE's witnesses "had ever spoken with, taught, served, or evaluated S.K." [DE 18-17 at 118]. As to Dr. Leach, S.K.'s only expert witness, the ALJ found Dr. Leach to be generally very knowledgeable in her nine areas of expertise and also noted that Dr. Leach had specific knowledge about S.K. based upon her review of the records, her observation of S.K. at Asheville Academy, and her discussions about S.K. with staff at Asheville Academy and Camelot Academy. [DE 18-17 at 28]. The ALJ went on, however, to find Dr. Leach's credibility diminished by several aspects of her testimony, including her repeated application of assumptions and perceptions about public schools generally. *Id.* However, as the SHRO found, the hearing transcript does not support the ALJ's finding that Dr. Leach "repeatedly" applied assumptions, and to the contrary reflects that Dr. Leach declined to make generalizations or assumptions. *See, e.g.,* [DE 18-3 at 143].

WCBOE argues that the transcript plainly reflects that on direct examination Dr. Leach found inadequacies in every aspect of the IEP, but then on questioning from the ALJ changed her tune, supporting the ALJ's decision to give less weight to her testimony. Contrary to WCBOE's assessment, the transcript does not reflect that Dr. Leach was unable to sustain her position on direct during questioning by the ALJ. Dr. Leach was permitted testify as an expert in the area of, among other things, IEP development, and on questioning by S.K.'s counsel she related the deficiencies she had identified in the May 2017 IEP. When asked by the ALJ whether there was

11

anything about the May 2017 IEP that she thought was appropriate, Dr. Leach identified areas where she thought the IEP was "getting to appropriateness" and others that she found appropriate. Dr. Leach clarified that while she did not take issue with the entirety of the May 2017 IEP, she determined that it was not sufficiently comprehensible for S.K. to be successful. *See, generally,* [DE 18-3 at 57 – 171].

The SHRO further found that the ALJ's reliance on Dr. Leach's lack of familiarity with WCPSS's Autism Support Program "introduce[d] a red herring because WCPSS'[s] Autism Support Program [was] not incorporated into the May 2017 IEP in whole or in part." [DE 18-17 at 161]. Moreover, the SHRO concluded that the record contradicted the ALJ's finding that Dr. Leach was not familiar with WCPSS's Autism Support Program based upon testimony that Dr. Leach had reviewed WCPSS's published descriptions of its Autism Support Program and compared those to S.K.'s May 2017 IEP. Dr. Leach concluded that the May 2017 IEP did not include the supports offered in the Autism Support Program. [DE 18-3 at 97].

Finally, the ALJ relied on Dr. Leach's lack of personal knowledge of the high school and the IEP Team members in question to discredit her testimony. The SHRO noted that "[w]hile Dr. Leach had not taught at or observed a class within the specific high school to which [WCPSS] assigned S.K., neither had [WCPSS's] expert, Dr. Faulkner, and the ALJ did not find Dr. Faulkner's lack of teaching or observation at the specific high school to which [WCPSS] assigned S.K. to create a 'lack of personal knowledge or experience that would undermine Dr. Faulkner's credibility.'" [DE 18-17 at 155 n. 29]. Nor did the hearing testimony reveal that Dr. Faulkner had any personal experience with S.K.'s IEP Team or that she had experience with WCPSS's Autism Support Program. [DE 18-18 at 22]. The record does, however, reflect that Dr. Leach had some familiarity with the IEP Team members, including R.K. and Stephanie Shaw, a

12

special education teacher with WCPSS. [DE 18-17 at 152-53]. Despite Dr. Faulkner having the same deficits in experience that the ALJ assigned to Dr. Leach, the ALJ declined to diminish Dr. Faulkner's credibility in any way.

The ALJ also diminished the credibility of Dr. Edwards, who was offered as a fact, not an expert, witness for S.K. [DE 18-17 at 27]. The ALJ found Dr. Edwards's report and her testimony about her report and evaluation of S.K. comprehensive and credible. The ALJ expressed concern, however, that Dr. Edwards had never worked in a public-school setting and that she had "repeatedly refused to answer questions that were appropriate subjects for questioning by [WCBOE]'s counsel." *Id.* at 29. The ALJ found that Dr. Edwards refused to answer questions about the necessity of a class-size cap for S.K.'s academic achievement, which the ALJ described as the central issue in the case, and that Dr. Edwards's unwillingness to answer demonstrated "that her expert opinion, if given, would not have been favorable to [S.K.]." *Id.*

Again, the record does not support the ALJ's finding. A review of Dr. Edwards's testimony does not reveal that she refused to answer questions, but rather that she attempted to limit her testimony to the scope of her report. Dr. Edwards was not called or admitted as an expert witness and thus was not permitted to express her scientific, technical, or specialized opinion. *See* Fed. R. Evid. 701-702. Nonetheless, she answered questions that went beyond the scope of her 2016 report when she was asked. *See, e.g.,* [18-2 at 61; 72-73; 76-78].

Critically, the ALJ's determination that Dr. Edwards refused to answer questions about the whether a class-size cap was necessary, which the ALJ described as the central issue in the case, is completely unsupported by the transcript. As the SHRO thoroughly explained, Dr. Edwards was never asked about class size or a class-size cap. WCBOE does not address this

13

error in its brief describing Dr. Edwards's testimony. Accordingly, the Court determines that the SHRO correctly declined to afford due weight to the ALJ's assessment of Dr. Edwards's testimony as it was based in large part on a misstatement of the record.

In diminishing the credibility of R.K., S.K.'s mother, the ALJ in her decision found that R.K. was unreasonable in her search for private schools, but during the hearing the ALJ had expressly found that it *was* reasonable for a parent to explore private school options given the time of year that the IEP was developed. *See* [DE 18-17 at 113]; *see also* [DE 18-3 at 270] ("I don't think it's unreasonable for a parent if they're not sure if the school is going to offer an appropriate IEP to look at other options."). The ALJ's written findings are in conflict with her statements at the hearing, and the written findings fail to explain the basis for departing from those statements.

Cases in this circuit have generally "focused on the *process* through which the findings were made", *J.P. ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008) (emphasis in original), when determining whether the hearing officer's findings were regularly made and thus entitled to due weight or to be considered *prima facie* correct. Here, the SHRO carefully considered each of the ALJ's credibility findings and determined that several were based on erroneous accounts of the record or were otherwise unsupported by it. The SHRO further fully explained her reasons for departing from the fact-finding of the ALJ, and the SHRO's grounds for doing so are supported by the record. The Court determines that findings based upon erroneous accounts of the record are not findings which were regularly made, and thus the SHRO did not improperly decline to afford deference to the ALJ's credibility determinations. Accordingly, the Court gives due weight to the SHRO's findings of fact regarding the testimony of the witnesses and their credibility.

14

II.    Small School, Small Class Size.

WCBOE next argues that the SHRO inappropriately reversed the ALJ's thorough decision supporting the determination that a small class size was not required for a FAPE. WCBOE further argues that the SHRO committed several errors in reversing the ALJ's carefully reasoned decision on class size.

In S.K.'s petition for a contested case hearing, S.K. requested that the IEP Team place S.K. in a small school with small class sizes as recommended by Asheville Academy. [DE 18-18 at 32]. Indeed, the ALJ and SHRO both recognized that a small-class setting for S.K.'s general education classes was "the heart of the case" [DE 18-18 at 28] and the "primary judiciable issue". [DE 18-17 at 22]. The ALJ, however, focused on whether the evidence in the record would support the need for a particular class-size cap, and concluded that S.K. had failed to demonstrate that a particular class-size cap was necessary.

The SHRO reversed this decision, concluding that S.K. had never requested a class-size cap, and thus a determination that she had failed to demonstrate that a particular class-size cap was necessary was unnecessary to deciding the petition. [DE 18-18 at 38-39]. Contrary to WCBOE's arguments, the SHRO's decision on this issue was regularly made and is well-supported by both her detailed explanation for departing from the ALJ's conclusion and the record, and the Court will thus afford it due weight.

The SHRO identified the gap in the ALJ's reasoning as to what both agreed was the primary issue in the case. S.K. never asked for a particular cap on class or school size, and thus she never presented any evidence which would support a determination that her school or classes must be limited to a particular size – and the ALJ in her decision held as much, concluding that the evidence supported the WCBOE's position that a class-size cap was not required in S.K.'s

15

IEP. [DE 18-17 at 61]. Instead of asking for a particular school or class-size cap, S.K. recognized that a small-class setting could be achieved in a number of different ways, including lowering the teacher-student ratio with the inclusion of teacher's aides or co-teachers, using fewer students in particular sections, and providing certain training to regular education teachers, not just special education teachers. [DE 18-18 at 35].

The Court is unpersuaded by WCBOE's argument that whether S.K. required a small school or class size necessarily hinged on defining the specific number of students in her classes. WCBOE has cited no case or regulation which requires that the term "small class" or "small-class setting" be defined by a particular number of students or a particular student-teacher ratio. Because the ALJ only considered the small school, small class size issue in the context of a class-size cap, she never reached the issue actually raised by S.K. Thus, the SHRO properly considered the issue presented by S.K.: "whether the May 2017 IEP failed to offer a FAPE when it failed to offer any accommodation(s) to address [S.K.'s] need for a small-class, small-school environment within S.K.'s general education classrooms . . .." [DE 18-18 at 39] (emphasis omitted).

WCBOE criticizes the SHRO's reliance on *Gellert v. District of Columbia Public Schools*, 435 F. Supp. 2d 18 (D.D.C. 2006), arguing that *Gellert* does not stand for the assertion that a child's need for a small class size must be met. This Court, like the SHRO, finds *Gellert* both instructive and persuasive in this context.

Gellert's parents removed him from D.C. Public Schools after his school performance deteriorated following his attendance at a public junior high school. Once enrolled at a private school, Gellert showed significant improvement in academics. Gellert suffered from emotional issues, including anxiety in crowded settings. After Gellert's parents and representatives from his

16

private school attended an IEP meeting, they "did not agree to the IEP that was developed because it did not contain a requirement for a small class size." *Id.* at 20. While the record included an opinion that Gellert should attend classes with no more than ten students, *id.* at 25-26, this does not, as WCBOE suggests, require that an expert persuasively establish a particular class-size cap or that parents request a class-size cap in order to sufficiently request a small class-size environment. Indeed, the *Gellert* court, as the SHRO did in this case, concluded that "without addressing the main point of contention between the parties—namely whether [the high school] could accommodate [Gellert's] need for a small class size and related services—the Hearing Officer could not have accurately determined whether [Gellert] could receive FAPE at [the high school]." *Id.* at 24.

WCBOE further contends that, as the ALJ determined, the fact that witnesses testified that S.K.'s *optimal* learning environment was a small-school, small-class setting, or that S.K. would do *better* in a small learning environment was not the proper way to frame the issue. WCBOE argues that none of the evidence shows that S.K. *required* a small class setting. *See also Bd. of Educ. of Frederick Cty. v. I.S. ex rel. Summers*, 325 F. Supp. 2d 565, 590 (D. Md. 2004) ("IDEA's FAPE standards do not require schools to provide an education that will enable the child to achieve maximal educational benefit."). To the contrary, however, S.K.'s March 2016 IEP with WCPSS "expressly recognized that S.K. 'requires small group instruction to complete her work . . . [and] meet grade level expectations.'". [DE 18-18 at 33]. This conclusion was supported by the findings of Dr. Leach, Dr. Edwards, and S.K.'s measured improvement while attending Asheville Academy, which provided small-class learning environments. S.K. was an intelligent student who could perform in a regular education classroom. [DE 18-18 at 29]. However, her complex diagnoses and disabilities prevented her from being able to retain and

process information in a large-class setting such as those offered through her May 2017 IEP. *Id.* (citing Hrg. Tr. 138-193).

The SHRO compared the March 2016 IEP to the May 2017 IEP and noted the similarities, especially regarding S.K.'s placement in a large regular education setting with time spent in a segregated, small-class resource setting. [DE 18-18 at 46-47]. But it was plain that the March 2016 IEP was insufficient to meet S.K.'s needs as it resulted in "below-grade-level performance, a failing grade in math, and a D in language arts". [DE 18-18 at 65]. WCBOE also contends that the Break Card accommodation in the May 2017 IEP allowed S.K. sufficient flexibility and access to small environment during the school day. The Break Card accommodation was designed as something that S.K. could use whenever she felt she needed to leave the large, general-education setting. She could use the Break Card to go to a resource room available only to disabled students or engage in other behaviors, such as taking a walk around the quad, which would help her get through her day. *See* [DE 18-14 at 61-64; 84]; [DE 18-5 at 980]. Though the Break Card offered a flexible way for S.K. to manage her day, it nonetheless required her to leave her general education classroom to get support, which, as her mother noted, would detract from S.K.'s ability to work hard and progress academically. The Break Card was not a sufficient substitution for a small-class environment which the March 2016 IEP, S.K's expert, and her teachers at Asheville Academy recognized that she needed.

In sum, the Court has considered the arguments raised by WCBOE on this issue and concludes that the record supports the SHRO's conclusion that S.K. required a small-school, small-class environment for her general education classes and that such an accommodation was not provided by the May 2017 IEP. Affording the SHRO's decision due deference, the Court finds WCBOE's arguments unavailing and declines to disturb the SHRO's decision on this issue.

III.    Private School Appropriateness and Entitlement to Reimbursement.

WCBOE next argues that the SHRO inappropriately reversed the ALJ's decision that the private school was not appropriate and S.K. and her parents were not entitled to reimbursement. WCBOE contends that the SHRO misconstrued the legal standard and afforded improper weight to selective factors in assessing the appropriateness of the private school. The Court disagrees and finds that the SHRO's findings were appropriately made and should be afforded due weight.

The IDEA requires a school district to reimburse a parent of a child with a disability the cost of enrollment in a private school if the school district has failed to offer a FAPE and the program is appropriate. 20 U.S.C. § 1412(a)(10)(c); *Florence Cty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 9-10 (1993). A private school need not meet the IDEA definition of a FAPE for a parent to obtain reimbursement, *id.* at 13, and "a parental placement is appropriate if it is reasonably calculated to enable the child to receive educational benefits." *M.S. ex rel. Simchick v. Fairfax Cty. Sch. Bd.*, 553 F.3d 315, 324 (4th Cir. 2009) (internal quotation and citation omitted).

Camelot Academy provided S.K. with a small-class environment, with an average class size of nine or ten students. [DE 18-2 at 95]. At Camelot Academy, S.K. was provided with organizational skills and study skills during her regular education classes. *Id.* at 135. Because of the small-school environment, Camelot Academy teachers are able to identify weaknesses in students' abilities and provide support across subjects. *Id.* at 96. While at Camelot Academy, S.K. experienced a decrease in anxiety and was able to achieve academic goals due to the small class size and her ability to feel safe and secure. *Id.* at 117. Camelot Academy does not have special education classes but is able to make needed accommodations within the general education classroom. *Id.* at 118. According to S.K.'s team at Camelot Academy:

19

Due to the consistent structure of the school day, very clear expectations, opportunities to take breaks when she needs them, accommodations for testing (e.g. one page at a time), preferential seating where S.K. is placed on the sides as opposed to in the center of the room to address her focus and attention issues as well as her sensory and social/emotional needs, academic success resulting from individualized instruction tailored to her present abilities and learning profile, and a culture in the school that encourages self-advocacy, S.K. has been able to maintain emotional regulation and meet academic, behavioral, and social expectations throughout the school day. She is able to ask questions if she needs help understanding content or assignment expectations, advocate for specific accommodations (e.g. more time, breaks, visual supports), and she raises her hand to answer questions in class.

[DE 18-4 at 11]. To be sure, several of these supports were included in S.K.'s May 2017 IEP, such as preferential seating, testing accommodations, and the opportunity to take breaks. A primary difference, however, is that Camelot Academy provided S.K. with a small-school, small-class environment. Although Dr. Shaw, a witness for WCPSS, had testified that S.K. would need instruction on social skills outside the regular classroom setting, S.K. appeared to be able to absorb social skill instruction within a small classroom setting with individualized support.

Finally, a finding that parents acted unreasonably may be grounds to reduce or deny a claim for tuition reimbursement. *See* 34 C.F.R. § 300.148(d)(3). As discussed above, the Court affords due deference to the SHRO's findings that R.K.'s actions were not unreasonable, and its own review of the record does not identify grounds to reduce the tuition reimbursement.

Based upon its review of the testimony and the record, and affording the SHRO's decision due weight, the Court determines that the program at Camelot Academy was reasonably calculated to enable S.K. to receive meaningful educational benefits. Thus, it was an appropriate placement under the statute. There are no grounds which would support a reduction of tuition reimbursement.

V.     Dismissal of Certain Claims.

20

Finally, WCBOE argues that the SHRO inappropriately reversed the ALJ's decision to dismiss certain claims following its Rule 41(b) motion. The Court agrees and declines to follow the SHRO's conclusions as to these claims.

The SHRO reversed the ALJ's dismissal of four claims, finding that the ALJ's findings of fact were insufficient. Those claims related to counseling/parent training, supplementary aids and services, the alleged refusal to fully evaluate S.K., and any procedural violations not related to parental participation. The Court agrees with WCBOE that adequate support for the ALJ's conclusions as to these claims can be found in the record.

S.K.'s mother testified at the hearing that she did not ask for parent training and that she did not remember asking for counseling at the IEP meeting because S.K. was already receiving counseling. [DE 18-2 at 208]. The record thus supports the ALJ's decision as to S.K.'s claim for counseling and parent training, and this claim was properly dismissed.

At the hearing, the ALJ stated on the record that she would dismiss all claims for supplemental aids and services except S.K.'s claim for a small class size. [DE 18-3 at 257-58]. The ALJ found dismissal of S.K.'s claims on supplemental aides and services appropriate because S.K.'s expert had opined that S.K.'s existing accommodations were appropriate. *Id.* This record was a sufficient ground on which to dismiss this claim.

The hearing transcript further supports the ALJ's dismissal of S.K.'s claims related to WCBOE's alleged refusal to fully evaluate S.K. S.K. alleged that WCBOE failed to evaluate S.K. in all areas. But the ALJ relied on the fact that, for example, as to a reading and math evaluation, the IEP Team had adopted S.K.'s private evaluation in reading in math, and thus the ALJ determined that an evaluation in reading and math had, in fact, been conducted. [DE 18-3 at

21

259-60]. Although S.K.'s allegation is not particularly clear, the ALJ's colloquy with counsel provides a sufficient basis on which to dismiss this claim. *Id.*

Finally, the ALJ included a catch-all dismissal of any other procedural violations, stating that, to the extent there were any additional procedural violations alleged by S.K., they had not been proven and would be dismissed. The Court discerns no error in the ALJ's statement.

V.    Conclusion.

The Court has conducted a modified *de novo* review of the record and the decisions in this case. The Court determines that the decision of the SHRO rather than the ALJ should be afforded due weight as it is based upon a thorough and exhaustive review of the record and includes detailed explanations for any departures from the ALJ's conclusions. The arguments by WCBOE, which has burden of proof in this action, fail to demonstrate that the decision of the SHRO was erroneous with the exception of the SHRO's reversal of the ALJ's Rule 41(b) dismissal of four of S.K's claims.

As discussed above, S.K. was an intelligent child whose unique and complex symptoms required placement in a small-school, small-class setting in order for her to benefit from instruction tailored to meet her needs. Affording the SHRO's decision due deference and based upon its own review, the Court concludes that WCBOE failed to offer S.K. a FAPE in the least restrictive environment and that the May 2017 IEP was not appropriate to meet S.K.'s needs. The Court further determines that S.K.'s placement in Camelot Academy was appropriate and S.K.'s parents are entitled to reimbursement.

*Motion for Attorney Fees*

Rhonda K., individually and on behalf of her minor child S.K., seeks attorney fees and costs against WCBOE as prevailing parties. Rhonda K. further seeks reimbursement of S.K.'s

22

educational expenses and related costs incurred. As discussed above, the Court has declined to disturb the holding of the SHRO that S.K. was denied a FAPE and that Camelot Academy was an appropriate placement. Accordingly, it is undisputed that Rhonda K. and S.K. are the prevailing parties for purposes of the IDEA. *See* [DE 40 at 3-4].

The IDEA provides for reasonable attorney fees to be awarded to the prevailing party who is the parent of a child with a disability. 20 U.S.C. § 1415(i)(3)(B)(i). The award of attorney fees is within the court's discretion. *Id.*; *J.D. ex rel. Davis v. Kanawha Cty. Bd. of Educ.*, 571 F.3d 381, 387 (4th Cir. 2009). Any fees awarded shall be based on the prevailing rates in the community in which the action arose, without the use of any bonus or multiplier. *Id.* at § 1415(i)(3)(C). "The court may award fees not only in the case before it but also with respect to the administrative proceeding." *Cone v. Randolph Cty. Sch. Bd. of Educ.*, No. 1:06CV00579, 2010 WL 1610445, at \*3 (M.D.N.C. Apr. 19, 2010). Finally, a court should consider not only the customary hourly rates but also the results obtained. *J.D. ex rel. Davis*, 571 F.3d at 387.

Rhonda K. requests a total of $159,271.00 in attorney fees and $911.43 in litigation expenses. The attorney fees are based upon a top hourly rate of $250 per hour, which WCBOE agrees is a reasonable rate based on the prevailing rate in this community. WCBOE does not object generally to the number of hours expended but does object to some of the billing entries as vague. WCBOE further requests a reduction in the overall fee request based upon Rhonda K.'s partial success in the litigation.

To calculate an award of attorney fees, the court "must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *Robinson v. Equifax Info Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009). Factors to consider in determining the reasonableness of the hours and rate include: (1) the time and labor required; (2) the novelty

23

and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the " undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Hensley v. Eckerhart*, 461 U.S. 424, 430 n.3 (quoting *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717– 19 (5th Cir. 1974)); *see also Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008).

As noted above, WCBOE does not contest the reasonableness of the rate or hours generally, though it does request a reduction in the overall fee based upon Rhonda K.'s limited success. The Court finds, however, that Rhonda K.'s success on her most significant claims – contesting the May 2017 IEP and obtaining a decision that S.K.'s placement at Camelot Academy was appropriate – supports her request for her full amount of attorney fees. *See J.D. ex rel. Davis.*, 571 F.3d at 387. Indeed, where a party "has obtained excellent results, his attorney should recover a fully compensatory fee. . . . In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley*, 461 U.S. at 435. The Court, in its discretion, declines to reduce Rhonda K.'s attorney fees based upon her failure to prevail on every contention she raised.

The Court has also considered the billing records in this matter and finds them to be sufficiently detailed. [DE 39-1]. The Court's review of the remaining *Johnson* factors further supports a full fee award. As detailed by Rhonda K. in her reply, this case presented a novel issue as North Carolina's public schools typically do not offer small-school or small-class

settings in the general education environment as an accommodation. Special education litigation on behalf of parents under the IDEA are not desirable cases, as is evidenced by the fact that there are only a handful of private special education attorneys in the state. *See, e.g.* [DE 1-3] *S.K. v. Wake Co. Public School Sys. Bd. Of Ed.*, No. 5:19-CV-498-BO (Nov. 6, 2019 E.D.N.C.). None of the other *Johnson* factors counsel in favor of a reduction in Rhonda K.'s attorney fees. Accordingly, the court awards Rhonda K. the full amount of attorney fees and litigation expenses requested.

The Court further awards Rhonda K. tuition and transportation reimbursement for the 2017-2018, 2018-2019, 2019-2020, and 2020-2021 school years. WCBOE agrees that if this Court upholds the SHRO decision, which it has, Rhonda K. is entitled to reimbursement for the 2017-2018 and 2020-2021 school years. WCBOE further does not contest that Rhonda K. is entitled to reimbursement for the 2019-2020 school year and it has reimbursed Rhonda K. for this school year. WCBOE contests reimbursement for the 2018-2019 based upon a waiver argument. The Court determines, however, that the stay-put provision of 20 U.S.C. § 1415(j) applies to the 2018-2019 contested school year. *See Rena C. v. Colonial Sch. Dist.*, 890 F.3d 404, 415 (3d Cir. 2018). Accordingly, Rhonda K. has demonstrated she is entitled to reimbursement for all four school years she has claimed.

The Court will not, however, award reimbursement for the costs of before-and-after school care. The statute provides for reimbursement of tuition and transportation costs, and Rhonda K. has cited no case law which would support reimbursement for care provided outside the typical school day. The Court therefore reduces Rhonda K.'s requested reimbursement by the amount claimed for these expenses *See* [DE 39-2]. Rhonda K.'s reimbursement award is

therefore $66,378.83, representing reimbursement for transportation in the amount of $17,560.83 and reimbursement for tuition and fees in the amount of $48,818.00.

## CONCLUSION

For the foregoing reasons, S.K. by and through her parent R.K's motion for leave to file surreply [DE 44] is GRANTED and the clerk is DIRECTED to file the proposed surreply at [DE 44-1]. Wake County Board of Education's motion for judgment on the administrative record [DE 36] is GRANTED IN PART and DENIED IN PART. The Court holds that S.K. was denied a free and appropriate public education based upon her May 2017 IEP and that her placement at the private school was appropriate to meet S.K.'s needs.

Rhonda K., individually and on behalf of her minor child S.K.'s motion for attorney fees and costs [DE 38] is GRANTED IN PART and DENIED IN PART. Rhonda K. is entitled to the full attorney fee request of $159,271.00 plus reasonable litigation expenses of $911.43. Rhonda K. is further entitled to private school tuition and transportation reimbursement in the amount of $66,378.83.

The clerk is DIRECTED to enter judgment in each of these consolidated cases and close the files.

SO ORDERED, this **26** day of May, 2021.

Terrence W. Boyle
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE